UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

* * * * * * * * * * * * * * * * * * *

George M. Teska and Darlene Teska, husband and wife,

Plaintiffs,

vs. MEMORANDUM ORDER

Potlatch Corporation, a foreign corporation, and Oscar J. Boldt Construction Co., a foreign corporation,

Defendants. Civ. No. 00-418 (RLE)

* * * * * * * * * * * * * * * * * * *

At Duluth, in the District of Minnesota, this 2nd day of January, 2002.

## I. Introduction

This matter came before the undersigned United States Magistrate Judge pursuant to the consent of the parties, as authorized by Title 28 U.S.C. §636(c), upon the Defendant's Motion in limine, and its Motion for Summary Judgment. A Hearing on the Motions was conducted on July 26, 2001, at which time the Plaintiffs George M. Teska, and Darlene Teska, appeared by Robert C. Bell, Esq., and the Defendant Oscar J. Boldt Construction Co. ("Boldt") appeared by Steven W. Schneider, Esq.

For reasons which follow, we grant the Defendant's Motion in limine, as well as its Motion for Summary Judgment.

31

FILED JAN 02 2002
RICHARD D. SLETTEN, CLERK
JUDGMENT ENTD JAN 02 2002
DEPUTY CLERK

## II. Factual and Procedural History

The Plaintiffs commenced this action after George M. Teska ("Teska") was injured, at work, on October 28, 1999. At that time, Teska was working as a boilermaker foreman on a project for the Potlatch Corporation ("Potlatch").[1] Potlatch was modernizing its oriented strand board facility, which is located in Cook, Minnesota, and it had hired Boldt as the general contractor. Boldt then subcontracted with The Jamar Company ("Jamar") for certain mechanical installations. See, Exhibit 1 to Affidavit of Steven W. Schneider (subcontract agreement between Boldt and Jamar). Teska was employed by Jamar.[2]

On October 28, 1999, a column was to be installed in the heat source area of the project. The column was a seventeen foot I-beam, and the installation of the column was Jamar's responsibil-

---

[1]Potlatch was also named as a Defendant in this action, but was voluntarily dismissed as a party, with prejudice, on December 28, 2000. See, Teska v. Oscar J. Bolt Construction Co., Civ. No. 00-418, Stipulation of Dismissal (D. Minn. December 28, 2000) [Docket No. 16].

[2]Jamar's superintendent on the site was Robert Larson ("Larson"), and Teska was the boilermaker foreman for the project. See, Deposition of Robert Larson, at 6, Exhibit 2 to Affidavit of Steven W. Schneider. The boilermakers were charged with the installation of the project's furnace. Id. at 6. Larson was the highest ranking Jamar boilermaker on the site at the time of the accident, and Teska was next highest ranking boilermaker. Id. at 8. Teska's responsibilities included supervising the remaining boilermakers who were installing the furnace, which included Timothy Sauter ("Sauter"), and David Kangas ("Kangas").

ity. See, Deposition of Robert Larson, at 14, Exhibit 2 to Affidavit of Steven Schneider ("Larson Deposition"). As the column was to be positioned vertically, it was necessary to employ a crane so as to move the column into place. For that purpose, Jamar requested the use of a large crane that had been maintained on the site by Boldt. Pursuant to the subcontract agreement, Boldt also provided the crane operator, who was Richard A. Fuglie ("Fuglie"), in conjunction with the crane. See, Exhibit 1 to Affidavit of Steven W. Schneider.

The process of securing the column, so that it might be lifted by the crane, is known as "rigging," and it was the boilermakers' responsibility to rig the column at issue here. See, Larson Deposition, at 14. According to Robert Larson ("Larson"), who was Jamar's superintendent on the site, it was his responsibility, as well as that of Teska, to ensure that the rigging was performed properly, and he had discussed the safest way to rig the column, with Teska, at some time prior to October 28, 1999. Id. at 8-9. Larson believed that it would be "advantageous" to rig the column with a shackle inserted in a hole at the top of the beam, and Teska apparently agreed. Id.

Although Teska generally recalls his conversation with Larson, he does not recall communicating Larson's instruction, concerning the use of a shackle, to the remaining members of the boilermaker

crew. See, Deposition of George M. Teska, at 155-56, Exhibit 4 to Affidavit of Steven W. Schneider ("Teska Deposition, Exhibit 4"). Moreover, the boilermaker crew, which was comprised of Timothy Sauter ("Sauter"), and David Kangas ("Kangas"), have testified that they had received no instructions as to how to rig the column. See, Deposition of David Kangas, at 13-14, Exhibit 5 to Affidavit of Steven W. Schneider ("Kangas Deposition"); Deposition of Timothy Sauter, at 15, Exhibit 6 to Affidavit of Steven W. Schneider ("Sauter Deposition").

Kangas eventually rigged the column for the lift, using a two-inch nylon sling as his primary rigging device. See, Kangas Deposition, at 13. Initially, he attempted to rig the column using a "double-wrap," but after the nylon sling was extended, it became apparent that the top of the column would come into contact with the "headache ball," which is a part of the crane-lifting mechanism, id. at 14-15, and would cause problems in placing the column as the column would not hang perpendicular to the ground. He then rigged the column with a "single wrap." Id. After rigging the column, Kangas consulted Sauter about when they would be ready for the lift, and Sauter questioned whether a shackle should be used for the rigging. See, Sauter Deposition, at 15. The two men then decided, however, that a shackle was not necessary. Id. at 17. Teska has described both Kangas, and Sauter, as well as himself, as

being "all experienced journeymen," Teska Deposition, at 35, who would have known the proper way to rig the column on account of their experience as boilermakers. Id. at 56.

After the column was rigged, Fuglie was called upon to operate the crane so as to lift the column into place. A portion of the lift, that Fuglie had to make, was a "blind lift." See, Deposition of Richard Fuglie, at 16, Exhibit 7 to Affidavit of Steven W. Schneider ("Fuglie Deposition"). In other words, there was a period of time during the lift when Fuglie was unable to see the column. Id. This "blind" period came at the end of the lift, when he was to position, and place, the column in its designated location. Id. To compensate for Fuglie's inability to observe the column during the "blind" portion of the lift, the boilermakers, who were Jamar employees, used hand signals to direct Fuglie. Id. Teska located himself at the point where the column was to be positioned, and secured, into place.

Once the column was close to Teska, he then relayed signals to Sauter, see, Deposition of George Teska, at 43, Exhibit 3 to Affidavit Steven W. Schneider ("Teska Deposition, Exhibit 3"), who had positioned himself where he could see both Teska and Kangas. See, Sauter Deposition, at 20. Sauter and Fuglie could not see each other, however. Id.; Fuglie Deposition, at 17. As a consequence, Sauter relayed his signals to Kangas, who then passed those signals

on to Fuglie. See, Sauter Deposition, at 20. Neither Kangas nor Fuglie could see Teska. See, Kangas Deposition, at 21; Fuglie Deposition, at 17. As the column was brought into position above Teska, and just before Fuglie began to lower the column into position, the column slid through the nylon sling, and fell to the ground. In the process of falling, the column caused the scaffolding, on which Teska was standing, to collapse. During the course of that collapse, Teska suffered numerous injuries, for which he initiated this action.

Teska claims that the rigging of the column, with the "single wrap" nylon sling, was inappropriate for this particular load, and that Fuglie had a duty to challenge the rigging procedure employed by the Jamar boilermakers. Consequently, Teska contends that Fuglie's action, in lifting the column, constituted a negligent act. Accordingly, Teska is suing Boldt on the basis of vicarious liability for the acts of Fuglie. As part of his claim, Teska offers the expert opinion of Gerald Sundboom ("Sundboom"), who expresses the opinion that a reasonably prudent crane operator would not have made the lift, under the circumstances here, because the rigging was not safe. In contrast, Boldt challenges the admissibility of Sundboom's testimony, and also seeks the entry of Summary Judgment, denying any liability, on its part, as a matter of law.

## III. Discussion

As noted, in its Motion in limine, Boldt challenges the admissibility of Sundboom's expert opinion, under Rule 702, Federal Rules of Evidence, and it also seeks Summary Judgment on two separate legal theories. First, if we grant Boldt's Motion in limine, and exclude the testimony of Sundboom, then Boldt argues that we must grant it Summary Judgment, as the Plaintiffs will be unable to demonstrate that Fuglie owed any duty to Teska, much less that he breached that duty. Second, Boldt urges that Fuglie's work, as a crane operator under the circumstances of this case, falls within the Loaned Servant Doctrine, so as to render him an employee of Jamar, who was also Teska's employer. Should the Loaned Servant Doctrine be found to apply, then, Boldt argues, Teska's claim would be barred by the Minnesota Worker's Compensation Act. See, Minnesota Statutes Section 176.001 et seq. Since they invoke distinct legal precepts, and analyses, we separately address Boldt's Motions.

### A. The Defendant's Motion in Limine to Exclude the Testimony of Sundboom.

The Plaintiff has identified the following as the opinions that Sundboom would express at Trial, were he called to testify:

1. A crane operator should reject a rigging by a nylon sling;

> 2. The proper way to rig the steel column would have been with a shackle;
>
> 3. The crane operator should not have lifted the steel column the way it was rigged.

Plaintiffs' Responsive Memorandum, at 5.

According to Boldt, however, Sundboom's opinions do not satisfy the requisites of Rule 702, Federal Rules of Evidence, and they are, therefore, inadmissible.

1. Standard of Review. The admissibility of expert testimony is governed, in large part, by Rule 702, Federal Rules of Evidence, which provides as follows:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Rule 702, Federal Rules of Evidence (2001).[3]

---

[3]Rule 703, Federal Rules of Evidence, also imposes the following restrictions on the provision of expert opinion evidence:

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need

(continued...)

As the Supreme Court has explained, "Rules 702 and 703 grant expert witnesses testimonial latitude unavailable to other witnesses on the 'assumption that the expert's opinion will have a reliable basis in the knowledge and experience of his discipline.'" Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 148 (1999), (quoting Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 592 (1993). When evaluating the admissibility of expert testimony, a Court must look to both the relevance, and the reliability, of the proffered testimony. See, Lauzon v. Senco Products, Inc., 270 F.3d 681, 686 (8th Cir. 2001), citing Daubert v. Merrell Dow Pharm., Inc., supra at 591-93; Bonner v. ISP Technologies, Inc., 259 F.3d 924, 929 (8th Cir. 2001); Jauregui v. Carter Mfg. Co., 173 F.3d 1076, 1082 (8th Cir. 1999).

"When it comes to admission of expert testimony under the Federal Rules of Evidence, a trial judge has a gatekeeping responsibility to 'ensur[e] that an expert's testimony rests on a reliable foundation and is relevant to the task at hand.'" Wheeling Pittsburgh Steel Corp. v. Beelman River Terminals, Inc., 254 F.3d 706, 714-15 (8th Cir. 2001), quoting Kumho Tire Co., Ltd. v. Carmichael, supra at 141. "Both the Eighth Circuit Court of Appeals and the

(...continued)

> not be admissible in evidence in order for the opinion or inference to be admitted.

Rule 703, Federal Rules of Evidence (2001).

Supreme Court have made clear that a person, although qualified as an expert in one area of expertise, may be precluded from offering opinions beyond that expertise, or that are not founded on a reliable methodology." Smith v. Rasmussen, 57 F. Supp.2d 736, 766 (N.D. Iowa 1999), citing Kumho Tire Co., Ltd. v. Carmichael, supra at 141.

Ultimately, "it is the responsibility of the trial judge to determine whether a particular expert has sufficient specialized knowledge to assist jurors in deciding the specific issues in the case." Wheeling Pittsburgh Steel Corp. v. Beelman River Terminals, Inc., supra at 715, citing Kumho Tire Co., Ltd. v. Carmichael, supra at 156. "Once initial expert qualifications and usefulness to the jury are established, however, a district court must continue to perform its gatekeeping role by ensuring that the actual testimony does not exceed the scope of the expert's expertise, which if not done can render expert testimony unreliable under Rule 702, Kumho Tire, and related precedents." Wheeling Pittsburgh Steel Corp. v. Beelman River Terminals, Inc., supra at 715.

"[B]efore accepting the testimony and opinion of an expert witness, the Trial court is charged with the 'gatekeeper' function of determining whether the opinion is based upon sound, reliable theory, or whether it constitutes rank speculation." See, Kemp v.

Tyson Seafood Group, Inc., 2000 WL 1062105 at *2 (D. Minn. July 19, 2000), citing Kumho Tire Co. v. Carmichael, supra at 141, and Daubert v. Merrell Dow Pharmaceuticals, Inc., supra at 589-90. "Expert testimony that is speculative is not competent proof and contributes 'nothing to a 'legally sufficient evidentiary basis.'" Concord Boat Corp. v. Brunswick Corp., 207 F.3d 1039, 1057 (8th Cir. 2000), quoting Weisgram v. Marley Co., 528 U.S. 440, 454 (2000).

As the Court in Kuhmo made clear, the Trial Court's gatekeeping function is to be employed for all expert testimony. Kuhmo Tire Co. v. Carmichael, supra at 141 ("We conclude that Daubert's general holding -- setting forth the trial judge's general 'gatekeeping' obligation -- applies not only to testimony based on 'scientific' knowledge, but also to testimony based on 'technical' and 'other specialized' knowledge."); see also, Rule 702, Federal Rules of Evidence, Advisory Committee Notes to 2000 Amendments ("Consistently with Kumho, the Rule as amended provides that all types of expert testimony present questions of admissibility for the trial court in deciding whether the evidence is reliable and helpful.").

Thus, "[i]n order to be helpful to the trier of fact, the witness must be qualified as an expert, the expert must have a reasonable factual basis for their testimony, the testimony must be based on reliable methods, and the testimony must be relevant to the facts at issue." Kemp v. Tyson Seafood Group, Inc., supra at

*2. As the Supreme Court, in General Electric Co. v. Joiner, 522 U.S. 136, 146 (1997), succinctly observed:

> Trained experts commonly extrapolate from existing data. But nothing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the ipse dixit of the expert. A court may conclude that there is simply to great an analytical gap between the data and the opinion proffered.

With these precepts in mind, we turn to the opinions that has been expressed by Sundboom.

2. Legal Analysis. The threshold issue before us is "specific not general," for we must "decide whether [Sundboom] had sufficient specialized knowledge to assist the jurors 'in deciding the particular issues in the case.'" Kumho Tire Co., Ltd. v. Carmichael, supra at 156-57, quoting 4 J. McLaughlin, Weinstein's Federal Evidence ¶702.05[1], p. 702-33 (2nd ed. 1998). We find that Sundboom has neither the specialized knowledge, nor an adequate factual basis, upon which to render expert opinions, on the duties and responsibilities of crane operators, that would assist the Jury in this matter.

The Record is uncontroverted that Sundboom's education consisted of a high school diploma, which he obtained in 1954, and about two months of vocational training, which was limited to "psychology applied to selling," and which he obtained in 1955. See,

Deposition of Gerald L. Sundboom, at 4-5, Exhibit 8 to Affidavit of Steven W. Schneider ("Sundboom Deposition"). He also attended the George Meany Labor Center on three different occasions, between 1974 and 1978, and enrolled in a course in labor law negotiations at the University of Wisconsin, in approximately 1977. Id. at 5-6.

Sundboom began working for the hoisting and portable division of the Operating Engineers Union in 1954. Id. at 7. Thereafter, he received on-the-job apprenticeship training for about two years. Id. at 7-8. It was during this period of time that he learned crane operation. After completing the two-year apprenticeship, Sundboom worked for another eleven years operating cranes for general contractors. Id. at 14. Thus, the relevant time frame, in which Sundboom was operating cranes, was from 1954 to 1967 -- over three decades before Teska's accident. Id. at 14. Notwithstanding this dated experience, Sundboom is not, and has never been certified as a crane operator, Id. at 17, and, other than for his apprenticeship, Sundboom has never attended any formal training sessions regarding the operation of cranes, although he did attend in-house safety meetings which were held as part of union meetings, as well as on-the-job "toolbox" meetings, in which safety issues were discussed. Id. at 8.

Sundboom has testified that, to his knowledge, there are no classes offered, by his local Union, which teach crane operators

the techniques of rigging, id. at 43-44, and he attributes the lack of such training to the fact that rigging is not the job of the crane operator. Id. at 44. Rather, Sundboom testified that crane operators must simply have an understanding of rigging procedures. Id. At no point, in his career, has Sundboom ever served as a member of any organization which promulgates standards for the operation of cranes, he has never written any articles concerning the matter of safe crane operation, and he has never provided any formal training on the operation of a crane. Id. at 18-19.

Since 1967, Sundboom has had no appreciable, relevant experience in working with cranes, or with crane operators. From 1967 to 1974, Sundboom was employed directly by his Union, first as a dispatcher, and then as a business agent.[4] Later, from 1974 to 1978, he worked as a representative of the International Union of Operating Engineers, and his duties consisted principally of helping local unions negotiate labor contracts. Id. at 15. In 1978, Sundboom became the regional director for the International Union of Operating Engineers, and he worked, in that position, until his retirement in 1996. Id. at 16.

---

[4]As a business agent, Sundboom's duties including dealing with problems which would arise in particular jobs, such as jurisdictional disputes, between the various construction trades. Id. at 15.

In preparing his opinion in this case, Sundboom reviewed the incident reports of Teska's accident, which were prepared by representative of both Jamar and Potlatch, the deposition of Fuglie, and photographs taken by the representatives of Boldt. Id. at 20-21.[5] He did not review any other documents, manuals, handbooks, or regulations, id. at 24; he did not view the site of the accident, id. at 21; he did not review the operative contracts, and subcontracts, id. at 22; and he did not interview any of the witnesses himself. Id. at 24. Sundboom conceded that he had not consulted any substantive texts, in forming his opinions in this case, and that he has relied solely upon his own past training and experience. Id. at 52. More importantly, the Record is bereft of any showing that Sundboom was personally aware of the construction practices of building contractors, particularly as they relate to the operation of a crane in Minnesota generally, or in northern Minnesota in particular, nor is there competent evidence to demonstrate that the opinions, which Sundboom is expected to express, have any contemporaneity.

Given the Record presented, it is inescapable that Sundboom's proposed testimony is the genre of opinion evidence that Daubert, and its progeny, were designed to spare the Courtroom. Were Sund-

---

[5]Sundboom also read the deposition testimony of Teska, Kangas, Sauter, John Raiha, and Larson. Id. at 23-24.

boom to merely testify that crane operators have a legal duty not to lift a load which they recognized as posing a threat to persons below, then no expert testimony would be necessary -- for such testimony would amount to no more than an expression of a generalized legal duty, as to which the Court could charge the Jury. Instead, Sundboom attempts to focus his testimony on affirmative acts which, in his view, Fuglie should have undertaken, as a crane operator, and thereby subject Fuglie's acts, or purported omissions, to a specific standard of care that the law does not generally recognize.

Under Minnesota law, which governs this aspect of our analysis,[6] "if it would be speculative for the factfinder to decide the issue of negligence without having the benefit of expert testimony on the standard of care, the expert testimony is necessary." Atwater Creamery Co. v. Western Nat'l Mut. Ins. Co., 366 N.W.2d 271, 279 (Minn. 1985); see also, Mozes v. Medtronic, Inc., 14 F. Supp.2d 1124, 1128 (D. Minn. 1998); Seaton v. County of Scott, 404 N.W.2d 396, 400 (Minn.App. 1987), rev. denied (Minn., June 25, 1987). If,

---

[6]"As a federal court sitting in diversity jurisdiction, we apply the law the forum state would apply." Winthrop Resources Corp. v. The Stanley Works, 259 F.3d 901, 903 (8th Cir. 2001), citing Klaxon Co. v. Stentor Electric Mfg. Co., 313 U.S. 487, 496-97 (1941). "[Minnesota] law governs the standard of care in this diversity action." Duston v. Daymark Foods, Inc., 122 F.3d 1146, 1147 (8th Cir. 1997), citing Erie R. Co. v. Tompkins, 304 U.S. 64 (1938).

however, "the acts or omissions complained of are within the general knowledge and experience of lay persons, expert testimony is not necessary to establish a standard of care, even in cases of alleged medical malpractice." Atwater Creamery Co. v. Western Nat'l. Mut. Ins. Co., supra, citing Hestbeck v. Hennepin Co., 297 Minn. 419, 212 N.W.2d 361 (1973).

With respect to Sundboom's opinions, which concern his belief as to the superiority of a shackle, over a sling choker, for the rigging of the column at issue here, we find no technicalities, in the physical concepts at play, which require expert testimony to establish Teska's case. Cf., Kolosky v. Underground Contractors of Perham, Inc., 1997 WL 30839 * 2 (Minn.App. 1997)(disclaiming the need for expertise, since the "jury was familiar with road construction crews digging trenches and using backhoes and jackhammers."). As we have gleaned from the full Record presented, the choker employs the physics of a noose or snare -- by tightly constricting around the width of the column, the column may be lifted into place and, when positioned, the noose can be loosened, and reused on the next column. A shackle, on the other hand, requires a metal connector to be inserted through a hole in the top of the column, secured by a threaded nut, and lifted by the crane to the proper location, where a boilermaker would have to unsecure the connector, by manually unthreading the nut.

Although the choker facilitates the removal of the rigging, over the shackle, the shackle provides a more secure connection to the column, while sacrificing ease of removal. Where, as here, the column does not have a plate, or other barrier, which could impede the choker from sliding over the top of the column, during the course of the lift, the shackle would theoretically, as a pure matter of physical science, provide a greater margin of safety than would be afforded by the choker. Of course, in all such matters of physical science, the degree of safety is on a continuum -- welding a connector to the column, for example, could theoretically provide a greater margin of safety than either a shackle or a choker. On the Record, it remains a Jury issue as to what margin of safety, if any, is realistically provided by a shackle over a choker, or whether the column fell because the choker was not properly fastened to the column, by Kangas and Sauter, so as to accomplish its intended purpose. On this Record, Sundboom is unable to afford any assistance to the Jury, on the superiority of one form of rigging over the other, as he did not personally witness the rigging procedure, and he brings no knowledge or experience to the Jury that lay persons would not already fully comprehend.

As to Sundboom's opinion, that Fuglie had an affirmative duty to inspect the rigging of Kangas and Sauter, we find that Sundboom's past experience and training -- as dated as it is -- pro

vides no suitable basis upon which a Jury could properly rely in determining whether such a professed standard of care should apply to all crane operators and, if so, whether it had been breached by Fuglie. We make plain, however, that we do not question Sundboom's assertion, that he holds the view that he professes, but his personally held opinion has no place in the Courtroom where, as here, it has neither a solid foundational basis in his experience, training or education, nor an objective source of verification.[7] In the

---

[7]We are mindful that the Plaintiffs have submitted two writings which they proffer as supportive of Sundboom's expression of a specialized standard of care for crane operators. See, Exhibits 2 and 5 to the Plaintiffs' Responsive Memorandum. In pertinent part, each exhibit states as follows:

> [The Crane Operator should] [u]nderstand load rigging procedures and advise the responsible person if a doubt exists as to the adequacy of the rigging (possible only when the load is visible to the operator). The operator shall reject any sling, choker, or rigging device which is inadequate, improper, or unsafe.

The sentiments expressed, however, do not bear the authority of any recognized rulemaking organization, which governs the conduct of crane operators, and was not recognized, as authoritative, by Sundboom or any other expert, in this litigation. While, under Rule 803(18), Federal Rules of Evidence, the content of those writings was "called to the attention" of Boldt's expert witness and, in part, to Sundboom, neither established the writings as a "reliable authority," nor do we find the substance of the writings to be sufficiently cogent to warrant our taking them as authoritative by judicial notice. See, Rule 201(b), Federal Rules of Evidence; see also, Lenscrafters, Inc. v. Vision World, Inc., 943 F. Supp. 1481, 1495-96 (D. Minn. 1996), citing Rule 56(e), Federal Rules of Civil Procedure)("Supporting and opposing affidavits shall be made on
(continued...)

vernacular, Sundboom's opinion, on this subject, is undergirded by no more than ipse dixit -- it must be so, merely because Sundboom has said it is so.

Although our role is not to determine whether Sundboom's opinion is a correct one, see Bonner v. ISP Technologies, Inc., supra at 929, the serendipitous nature of his proposed standard of care is reflected in the following exchange:

> Q. In the case where this lift is made using a shackle, is it the crane operator's responsibility to determine that the shackle pin has been completely tightened before the lift is made?
>
> A. No.
>
> Q. Is it the crane operator's responsibility to determine that the shackle being used is properly rated for the lift?
>
> A. No.
>
> Q. Is it the crane operator's responsibility to determine that the sling being used is properly rated for the lift?
>
> A. No.
>
> Q. Is it the crane operator's responsibility to inspect the sling being used for damage which might affect its ability to handle the load?

---

[7](...continued) personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein.").

A. No.

Q. All of those responsibilities that I've just gone through are the responsibilities of members of the rigging crew?

A. Correct.

Sundboom Deposition, at 51-52.

Given Sundboom's disclaimer, as to any affirmative duty on the part of crane operators, to closely inspect the actions, or omissions, of the rigging crew in the foregoing particulars, we are unable to discern any distinction as to why Fuglie had an affirmative duty to reject the form of rigging, that the boilermakers here had chosen to employ, apart from the fact that the choice of rigging is alleged to have caused injury to the party who retained Sundboom to testify. Such a distinction provides an infirm foundation for expert testimony.

All concede -- understandably, we think -- that the column was not properly rigged, and that the failure in rigging ultimately led to Teska's injury. The column did not fall because the slings were worn, and broke, or because the crane's boom was caused to strike some foreign object. Rather, the accident occurred because the column was not safely secured for the entirety of its passage, from the point of lift, to the point at which the column would be secured into place. Indeed, the accident reports of both Jamar, and Potlatch, as well as the testimony of Larson and Teska, have iden-

tified improper rigging as the sole cause of the accident. Left to be determined, however, is whether that cause was attributable to some failure to properly deploy a choker, or due to some incapacity in a choker, as a rigging device, to perform the task assigned -- an incapacity which Fuglie, as a crane operator, should have recognized. As to that determination, however, Sundboom is unable to express an admissible opinion, as he has proffered no basis to comment on any crane operator's training, other than his own, and that had been completed some thirty-plus years before Teska's accident occurred.

Accordingly, finding fatal deficiencies in Sundboom's qualifications to testify concerning the specialized standard of care he would apply to crane operators, and finding that his other proffered opinions are within the province of lay persons, and would not be assisted by Sundboom's purported expertise, we grant Boldt's Motion *in limine* to exclude Sundboom's opinions at the time of Trial.[8]

---

[8]The Plaintiffs have also retained Ron Youngdahl ("Youngdahl"), as a backup expert to testify if Sundboom is unavailable at the time of Trial. We earlier excluded Youngdahl as an expert, since the disclose of his opinions was untimely, although we allowed for the possibility that Youngdahl might be permitted to testify if Sundboom was not available. Given the absence of full briefing on the specific issue of Youngdahl's expertise, we express no view as to whether Youngdahl's opinion testimony would elude the fatal failings of Sundboom's proposed testimony.