B. The Defendant's Motion for Summary Judgment.

In addition to Boldt's Motion to exclude the testimony of Sundboom, it has also moved for Summary Judgment on two different grounds. First, Boldt contends that, without Sundboom's testimony, the Plaintiffs have failed to advance a prima facie case of negligence that would be cognizable against it at the time of Trial. Second, Boldt argues that, under the Loaned Servant Doctrine, Fuglie should be treated as an employee of Jamar, who also employs Teska and that, resultantly, Teska's suit is barred by the Minnesota Worker's Compensation Act. After reviewing the appropriate Summary Judgment standard, we will address each of these contentions in turn.

1. Standard of Review. Summary Judgment is not an acceptable means of resolving triable issues, nor is it a disfavored procedural shortcut when there are no issues which require the unique proficiencies of a Jury in weighing the evidence, and in rendering credibility determinations. See, Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986). Summary Judgment is appropriate when we have viewed the facts, and the inferences drawn from those facts, in a light most favorable to the nonmoving party, and we have found no triable issue. See, Krentz v. Robertson, 228 F.3d 897, 901 (8th Cir. 2000); Curry v. Crist, 226 F.3d 974, 977 (8th Cir. 2000); Carter v. St. Louis Univ., 167 F.3d 398, 400 (8th Cir. 1999).

For these purposes, a disputed fact is "material" if it must inevitably be resolved and the resolution will determine the outcome of the case, while a dispute is "genuine" if the evidence is such that a reasonable Jury could return a Verdict for the nonmoving party. See, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Herring v. Canada Life Assurance, 207 F.3d 1026 (8th Cir. 2000); Liebe v. Norton, 157 F.3d 574, 578 (8th Cir. 1998); Dodd v. Runyon, 114 F.3d 726, 729 (8th Cir. 1997).

As Rule 56(e) makes clear, once the moving party files a properly supported Motion, the burden shifts to the nonmoving party to demonstrate the existence of a genuine dispute. In sustaining that burden, "an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavit or as otherwise provided in this Rule, must set forth specific facts showing that there is a genuine issue for trial." Rule 56(e), Federal Rules of Civil Procedure; see also, Anderson v. Liberty Lobby, Inc., supra at 256; Allen v. Entergy Corp., 181 F.3d 902, 904 (8th Cir. 1999); Jauregui v. Carter Mfg. Co., supra at 1085. Moreover, the movant is entitled to Summary Judgment where the nonmoving party has failed "to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, supra at 322; see also, Hammond v. Northland

Counseling Center, Inc., 218 F.3d 886, 891 (8th Cir. 2000); Greer v. Schoop, 141 F.3d 824, 826 (8th Cir. 1998). No genuine issue of fact exists in such a case because "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Celotex Corp. v. Catrett, supra at 323; see also, Bell Lumber and Pole Co. v. United States Fire Ins. Co., 60 F.3d 437, 441 (8th Cir. 1995); McLaughlin v. Esselte Pendaflex Corp., 50 F.3d 507, 510 (8th Cir. 1995); Settle v. Ross, 992 F.3d 162, 163 (8th Cir. 1993).

2. Legal Analysis.

a. The Prima Facie Case of Negligence.

Boldt asserts that, without Sundboom's testimony, the Plaintiffs will be unable to prove that Boldt, vicariously though Fuglie, owed Teska a duty of care, or that Fuglie breached that duty. We disagree.

To make out a case of negligence, a plaintiff must show that the defendant owed the plaintiff a certain duty of care; that the defendant breached that duty; and that the breach proximately caused the plaintiff injury. See, e.g., Gilbertson v. Leininger, 599 N.W.2d 127, 130 (Minn. 1999); Johnson v. State, 553 N.W.2d 40, 48 (Minn. 1996); Hudson v. Snyder Body, Inc., 326 N.W.2d 149 (Minn. 1982); Gradjelick v. Hance, 627 N.W.2d 708, 711 (Minn. App. 2001). To prove that Fuglie, and therefore Boldt, owed Teska a duty of

care, and that the duty was breached, the Plaintiffs have relied, in no small part, on the proposed expert testimony of Sundboom. While we have determined that Sundboom's testimony is inadmissible, that determination does not end our inquiry, however.

Apart from any specialized standard of care, Boldt, through Fuglie, owed Teska the standard of care that a reasonable man would have exercised under the same or similar circumstances -- that is, the ordinary standard of care that is applicable in negligence actions under Minnesota law. See, Blatz v. Allina Health System, 622 N.W.2d 376, 383 (Minn.App. 2001)("An ordinary person has a duty to do what a reasonable person would do under the same or similar circumstances.")[quoting W. Page Keeton, Prosser and Keeton on the Law of Torts §37, at 236 (5th ed. 1984)], rev. denied (Minn., May 16, 2001); see also, Seim v. Garavalia, 306 N.W.2d 806, 810 (Minn. 1981)("The standard for ordinary negligence is 'the traditional standard of the reasonable man of ordinary prudence.'"), quoting Prosser, "Contributory Negligence as a Defense to Violation of Statute," 32 Minn.L.Rev. 105, 110 (1948). Under Minnesota law, "[n]egligence consists of 'a departure from a standard of conduct required by the law for the protection of others against unreasonable risk of harm." Seim v. Garavalia, supra at 810, quoting Prosser, supra at 110.

Whether Fuglie and, resultantly Boldt, breached this duty of care is, quintessentially, a Jury issue, as the material facts are genuinely in dispute. Teska contends that, notwithstanding Fuglie's experience as a crane operator, Fuglie should have recognized the palpable danger in rigging the column with a choker as it had been done by Kangas and Sauter. Fuglie denies any such appreciation of danger, and maintains that the employment of such chokers is commonplace in the construction industry. Fuglie's denial, at least implicitly, is supported by the actions of Kangas, and Sauter, who elected to employ a choker, after having considered the feasibility of a shackle. According to Teska, however, as experienced boilermakers, Kangas, and Sauter, should have known better.[9]

---

[9]During the course of his deposition, Fuglie testified as follows:

> Q. * * * Have you ever made a lift of this type of column by means of the single choke where the end of the col -- where the end of the column is of no greater circumference than the body of the column itself?
>
> A. Yeah.
>
> * * *
>
> Q. In all the training you've had, including this certification process that you went through, were you ever told that it's an acceptable -- acceptable way to rig this type of column (indicating) with a single choke that was used on this lift?

(continued...)

Given this conflict in the evidence, we conclude that the issue of whether Boldt, through Fuglie, committed a negligence act which proximately caused injury to Teska is properly a matter for the Jury's determination, and we deny Boldt's Motion for Summary Judgment on that ground.

b. The Loaned Servant Doctrine.

Boldt also seeks Summary Judgment on the basis of the Loaned Servant Doctrine, as Boldt contends that, at the time

---

[9](...continued)

> A. I don't think I was ever trained one way or the other as to what would be acceptable, because we depend on the craft that we're working with to know how to rig.
>
> Q. Is it true that you can refuse to make a lift that you do not believe is safe to make?
>
> A. Yes. That's true.
>
> Q. In fact, that's the crane operator's responsibility, is it not?
>
> A. I guess it can be. Yeah.
>
> * * *
>
> A. It's -- it's my prerogative to not make a lift -- yes -- if I think that it's not safe. Yes.

Fuglie Deposition, at 20-21.

Although he did not employ the phraseology of as the reasonable person standard, Fuglie's recognition, that he owed a duty to those surrounding him, not to lift an unsafe load, incorporates an equivalent duty of care.

of the accident, Fuglie -- although normally employed by Boldt -- was acting as a loaned servant of Jamar, which also employed Teska. As a consequence, Boldt maintains that the Minnesota Worker's Compensation Act bars the recovery that the Plaintiffs seek here. See, Minnesota Statutes Section 176.001 et seq.

In an employer-employee relationship, an employer can be held vicariously liable for the negligent acts of its employee, as long as those acts are within the "course and scope of [the employee's] employment." Ismil v. L.H. Sowles Co., 203 N.W.2d 354, 357 (Minn. 1972). By commencing his action against Boldt, Teska seeks to recover damages, over and above his Workers Compensation benefits, by asserting that Fuglie was negligent in his operation of Boldt's crane, thereby vicariously imposing liability upon Boldt. In a case such as this, however, where one employer -- Jamar -- is using another employer's employee, the Loaned Servant Doctrine works to shift liability for that employee's negligent acts from the regular or general employer -- here, Boldt -- to the borrowing or special employer -- here, Jamar. Id. If the Loaned Servant Doctrine should apply, then Boldt cannot be held vicariously liable for Fuglie's alleged negligence because, at the time of the injury, Fuglie was effectively an employee of Jamar.

Two tests are employed in determining whether a worker is a loaned servant. The first is the "whose business" test, which

asks, "[a]t the time of the negligent act, which employer's business was being done or furthered." See, Nepstad v. Lambert, 50 N.W.2d 614, 620 (Minn. 1951); see also, Ismil v. L.H. Sowles Co., supra at 257. The second test is the "right of control or direction test," which was explained, in Nepstad, as follows:

> The so-called "right of control or direction" test assumes to place the responsibility for the servant's negligence upon the employer having the right to control his actions at the time the negligent act occurs.

Id.

As the Nepstad Court observed, determining the applicability of the Loaned Servant Doctrine is normally a question for the factfinder, although "it is well established that," if there are no factual disputes, "and no jury would be entitled to find that there was not a loaned-servant relationship, the question becomes one of law." Id. at 619.

In Nepstad, the plaintiff was employed by the L.G. Arnold Co. ("Arnold"), which was a general contractor working on a project in Menomonie, Wisconsin. Id. at 617. In order to perform certain work on the project, Arnold rented a crane, and two crane operators, from one of the Defendants, J.M. Lambert ("Lambert"). Id. The crane was first employed to install prefabricated trusses and, since the crane operator, who was employed by Lambert, could not hear oral instructions over the noise of the crane, his movements

were directed entirely by hand signals, which were given by Arnold's employees. Id.

In addition, the crane was used to move four steel truss sections from the north side to the south side of the plant. Id. Although there was a discussion as to the route, and procedures, that would be used to move the trusses, the crane operator was not a part of that discussion, and only knew what he was supposed to do when he was provided with appropriate signals. Id. at 619. While backing along the road, the crane operator, who was not able to see what was behind him, again took signals from the general contractor's foreman, or from the plaintiff. Id. At some point, during the movement of the trusses, a portion of the crane came into contact with a power line, and caused injuries to the plaintiff. Id.

In Nepstad, the Court determined that the "whose business" test did not aid the analysis there, and the Court went on to explain, as follows:

> This test is practically valueless where, as in the instant case, the general employer's business consists of furnishing men to perform work for the special employer, because by doing his job the worker is necessarily furthering and doing the business of both employers. If the test is meant to determine whether or not the worker's status was that of a servant of an independent contractor at the time of the negligent act, then it only begs the ques-

> tion and must depend for its answer on the 'control' test.

Id. at 620.

Although the same observation is not entirely true in this case, as Boldt's entire business did not consist of renting cranes and operators to other contractors, we still believe, as do the parties, as reflected in their briefing, that the pivotal test is the "right of control" inquiry.

Nonetheless, even if we were to apply the "whose business test," so as to determine "which employer's business was being done or furthered" at the time of the negligent act, see, id., it is clear that it was Jamar's business that was being furthered at the time Teska was injured, since it was Jamar's responsibility to install the columns that prompted the injuries sustained. See, Larson Deposition, at 14. More importantly, it was Jamar's responsibility to rig the columns to be lifted by the crane. See, Larson Deposition, at 14; see also, Ismil v. L.H. Sowles Co., supra at 124 ("The question is not whether the worker remains the employee of the general employer as to general matters, but whether, as to the act in question, he is acting in the business of and under the direction of the borrowing employer.").

Under the "right of control" test, the "crucial question is which employer had the right to control the particular act giving rise to the injury." Nepstad v. Lambert, supra at 621-22; see

also, Minnkota Power Coop., Inc. v. Manitowoc Co., 669 F.2d 525, 531 (8th Cir. 1982); Ismil v. L.H. Sowles Co., supra at 124 ("[T]he directions of the borrowing employer must be commands and not requests if the employee is to be converted into a loaned servant, and * * * the borrowing employer must have authority to exercise detailed authoritative control over the manner in which the employee is performing the work."). The lending, or general employer, does not have to completely surrender all control over the employee, and the borrowing, or special employer, does not have to exercise complete control over the employee, such as the ability to discipline or to fire. See, Nepstad v. Lambert, supra at 621. Both employers may have control over the employee, and there is nothing "logically inconsistent * * * in finding that a given worker is the servant of one employer for certain acts and the servant of another for other acts." Id.

As the Court elaborated, in Nepstad, for the doctrine to apply, the orders of the borrowing employer must be commands, not requests. Id. at 622. "Authority to designate only the result to be reached is not sufficient under the control test." Id. Rather, "[t]here must be the authority to exercise detailed authoritative control over the manner in which the work is to be done." Id. Thus, actions such as hand signaling, which have the effect of commands in certain situations, have lead a number of Courts to con-

clude that the doctrine applies. See, e.g., Ismil v. L.H. Sowles Co., supra at 123 (deciding that the facts of the case created a question of fact for the Jury on the Loaned Servant Doctrine); Nepstad v. Lambert, supra at 622 (determining that, on the facts of the case, the Loaned Servant Doctrine applied as a matter of law); Salmonson v. M.A. Mortenson Co., 1993 WL 367572 (Minn. App. 1993) (same). Moreover, the Courts have not interpreted the doctrine narrowly and, therefore, do not require that every movement of the borrowed employee be dictated by the borrowing employer. See, Ismil v. L.H. Sowles Co., supra at 123. Rather, as long as the borrowing employer had the exclusive right to direct all movements, the doctrine applies. See, Nepstad v. Lambert, at 623 ("The absence of actual control at the time of the negligent act does not alter its liability.").

It is beyond dispute that, at the time that the column was lifted, Fuglie's actions, in operating the crane, were under the control and direction of Jamar -- the borrowing employer. After the column was first rigged, Jamar's employees were not satisfied that the column would hang perpendicular to the ground, and they caused the column to be rigged differently, not at Fuglie's request or command, nor because of any slippage in the double choke that had initially been applied. The decision to rig the column differently only followed a discussion, between Kangas and Sauter, in

which the comparative uses of a choke, or a shackle, were explored. There is no suggestion, let alone evidence, that Fuglie was asked to participate in that discussion, that he made any recommendations as to the type of rigging to employ, or that he was directed by anyone, from either Boldt or Jamar, to evaluate the rigging that the boilermakers had elected to apply.

Absent from this Record is any indication, however slight, that during the time that Fuglie physically observed the lift, there was any indication that the column was not secured by the choke that the boilermakers had applied. Nor is there any showing, in this Record, that Fuglie was controlling the ultimate placement of the column, when it slipped from its rigging. The movement of the column was at the direction of Jamar's employees, who had positioned themselves at the point of the column's ultimate descent in order to weld the column into its designated place. To do so, Fuglie took direction from the Jamar employees, as those directions were communicated from Teska, to Sauter, to Kangas, to Fuglie. Since, during the "blind" portion of the transfer, Fuglie could not observe the placement of the column, his movement of the crane, and of the column dangling from the crane, was solely at the direction of Jamar's employees. There is not the slightest showing that Boldt, or anyone other than a Jamar employee, was involved in directing Fuglie's actions. Given the Record presented, we are unable

to meaningfully distinguish the Minnesota Supreme Court's holding, in Nepstad, from the circumstances which resulted in Teska's injuries, and we conclude, as a matter of law, that the Loaned Servant Doctrine applies, so as to effectively convert Fuglie into a Jamar employee at the time of the accident.

In contrast, the Plaintiffs urge us to find that the negligent act was not the lift of the column itself, but was Fuglie's decision to make the lift. As a result, they contend that Summary Judgment is inappropriate because a Jury could find that, at the time of the negligent act -- assertedly, the decision to make the lift -- Fuglie was not under the control of Jamar. In particular, the Plaintiffs point to testimony of Fuglie, and of Boldt's expert, Ronald M. Kohner, that a crane operator has the authority to refuse to make a lift that he deems unsafe. See, Fuglie Deposition, at 21; Deposition of Ronald M. Kohner, at 47-8, Exhibit 2 to Plaintiffs' Responsive Memorandum Opposing Defendant's Motion in Limine and Motions for Summary Judgment.

While we can accept, as Fuglie admits, that he can refuse to do what he regards as an unsafe act, were we to agree with the Plaintiffs, then the Loaned Servant Doctrine would never have application, for every employee, loaned or otherwise, ultimately has the discretion to refuse to do an act which he or she regards as unsafe. The issue is not whether Fuglie could refuse the lift

but, rather, whose employee was he when that decision was presented. Here, notwithstanding the Plaintiffs protestations to the contrary, Fuglie was integrally a part of a team effort to move a column from one point to another. A portion of that team rigged the column, and then re-rigged the column, according to their past experience and training. Fuglie's responsibility was to operate the crane so as to transfer the column according to the directions provided by Jamar's employees. Contrary to the Plaintiffs' argument, we have found no authority, and the Plaintiffs cite none, which elevates a crane operator into the position of an insurer for the safe rigging of a load to be lifted, when the load is rigged by the employees of the borrowing employer, and the transfer of the load is directed by those same employees, in order to satisfy the contractual obligations of that borrowing employer. Thus, we find that, as a matter of law, Jamar had the exclusive right to control Fuglie at the time of the accident which resulted in injury to Teska and, consequently, we conclude that the Loaned Servant Doctrine applies so as to deny a recovery from Boldt over and above the Workers Compensation benefits which Teska has received to date. Therefore, we grant the Defendant's Motion for Summary Judgment on this ground.

Lastly, even though the line of authority was not identified, nor argued, by the parties, we further conclude that the same re-

sult is required by what appears to be a slight variant of the Loaned Servant Doctrine. In Ritter v. M.A. Mortenson Co., 352 N.W.2d 110 (Minn.App. 1984), a steel worker, who was employed by a subcontractor of M.A. Mortenson ("Mortenson"), elected to receive Workers Compensation benefits for an injury he sustained, when he was struck by the boom of a crane which had been supplied by Mortenson, and which was then being operated by a Mortenson employee. Mortenson moved for Summary Judgment, arguing that the crane operator was a loaned servant, but Summary Judgment was ultimately granted on the basis of Minnesota Statutes Section 176.061, Subdivisions 1 and 4, which provide as follows:

> Subdivision 1. Election of remedies. If an injury or death for which benefits are payable occurs under circumstances which create a legal liability for damages on the part of a party other than the employer and at the time of the injury or death that party was insured or self-insured in accordance with this chapter, the employee, in case of injury, or the employee's dependents, in case of death, may proceed either at law against that party to recover damages or against the employer for benefits, but not against both.
>
> * * *
>
> Subdivision 4. Application of subdivisions 1, 2, and 3. [The above provision applies] only if the employer liable for benefits and the other party legally liable for damages are insured or self-insured and engaged, in the due course of business in, (a) furtherance of a common enterprise, or (b) in the accomplishment of the same or related purposes in opera-

> tions on the premises where the injury was received at the time of the injury.

In applying these statutory provisions, the Court stated the requisites of proof, as enunciated in McCourtie v. United States Steel Corp., 253 Minn. 501, 506, 93 N.W.2d 552, 556 (Minn. 1958), as follows:

> (1) The employers must be engaged on the same project;
>
> (2) The employees must be working together (common activity); and
>
> (3) In such fashion that they are subject to the same or similar hazards.

Ritter v. M.A. Mortenson, Co., supra at 112.

The Court proceeded to note that the focus of the inquiry should be upon the activities of the employees, rather than the employers, and drew the following guidance from McCourtie:

> Before such common activity can be said to exist there must be work in which both sets of employees participate * * *. Where however two employers perform different types of work, such as steel construction work and plumbing, and where the performance of these jobs is not related except in a vague, general way looking toward the completion of a structure, and where the activities of the two sets of employees have nothing in common and do not share or join in any of the work between themselves, it cannot be said that the employees are within the "common activities of the employees test" * * *.

Id., citing McCourtie v. United States Steel Corp., supra at 510, 93 N.W.2d at 559.

Having set forth the governing principles of law, the Court concluded, as follows, that the "common enterprise" provision precluded the steel worker from maintaining a negligence action against the employer of the crane operator:

> The facts in the record are undisputed that both Mortenson and the appellant's employer, H.D., were engaged in the same project -- the construction of an MTC garage. It is also agreed by both parties that the appellant and the crane operator were both engaged in erecting the steel superstructure for the building. The steel erection crew consisted of the foreman, two "hookers", whose function was to hook steel beams on to the crane, the crane operator, who hoisted the steel beams, and two "connectors," who connected the beams to the existing structure. The "connectors," appellant and another man, also were responsible for signaling commands to the crane operator. The appellant and the crane operator were thus clearly working together in furtherance of the same objective. Indeed, the appellant in his own deposition stated that they were all part of one crew, which was normal for that type of operation. As the trial court noted further, each of those crew members were subject to the same or similar hazards of the job, such as falling beams, electrical shock, injury from the crane, etc.

Ritter v. M.A. Mortenson Co., supra at 113.

Ultimately, the Court concluded, as a matter of law, that since the steel worker had elected to receive Workers Compensation benefits for his injuries, he was precluded, by the provisions of Minnesota Statutes Section 176.061, from "also bringing this common law action against Mortenson."

We seriously doubt that any authority, under the laws of Minnesota, could be found which more closely assimilates the facts presented by the Plaintiffs' claims here, than that presented in Ritter. Apart from a different mode of injury -- namely, being struck by the boom of the crane, as opposed to Teska's fall, owing to the accidental slip of the column from its rigging -- the Court's decision, in Ritter, is factually apposite. There can be no serious question that Fuglie, and Teska, were working on the same project, and were working together in a common activity and, as recognized by the Ritter Court, they were exposed to the same or similar hazards of the job, including "falling beams, electrical shock, injury from the crane, etc." Id. Indeed, the hazard to Fuglie of an injury from a falling column, which had not been properly secured, was more proximate, and predictable, than the likelihood that a crane operator would be struck by the crane's boom, which was the circumstance in Ritter.

Although the Court's analysis, in Ritter, was not subject to direct review by the Minnesota Supreme Court, subsequently, the Court has had occasion to interpret the import of Minnesota Statutes Section 176.061, under circumstances less compelling than either here, or in Ritter, and it has applied the prohibitions of that statute so as to preclude an action against a general contractor who was engaged in a common enterprise with a subcontractor

who employed a worker, who had been injured in the course of that common enterprise, by an employee of that general contractor, because the injured employee had elected to obtain Workers' Compensation benefits from his own employer. See, O'Malley v. Ulland Bros., 549 N.W.2d 889, 897 (Minn. 1996). Here, the Record reflects that Teska has been paid and, at the time of his deposition, was continuing to be paid, Workers' Compensation benefits for his injuries, presumably at the expense of Jamar, or Jamar's Workers Compensation insurer. See, Teska Deposition, at 145. Even if those benefits had been paid by Boldt, the result we reach would not be different. See, Ritter v. M.A. Mortenson Co., supra at 111 (Preclusion of Section 176.061 applied even though general contractor had paid the Workers Compensation benefits to the injured employee of a subcontractor because the subcontractor had failed to obtain the proper coverage for its employees). Accordingly, we grant Summary Judgment to Boldt on the basis of Section 176.061, as well. See, O'Malley v. Ulland Bros., supra at 897 ("A determination of whether a common enterprise existed is a legal determination, and not a factual inference.").

NOW, THEREFORE, It is --

ORDERED:

1. That the Defendant's Motion in limine [Docket No. 27] is GRANTED.

2. That the Defendant's Motion for Summary Judgment [Docket No. 27] is GRANTED.

BY THE COURT:

Raymond L. Erickson
UNITED STATES MAGISTRATE JUDGE